# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00316-CV

### TX Far West, Ltd., Appellant

### v.

### Texas Investments Management, Inc., Appellee

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
## NO. GN200239, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## O P I N I O N

This case involves a restrictive covenant that purportedly requires appellant TX Far West, Ltd. ("TX Far West") to pay an annual maintenance fee to appellee Texas Investments Management, Inc. ("appellee"). Because appellee never developed the land as originally contemplated, TX Far West sought a declaratory judgment that appellee had breached the restrictive covenant, and, in the alternative, that the restrictive covenant is not enforceable. Both parties moved for summary judgment, and the district court granted summary judgment for appellee and denied summary judgment for TX Far West. TX Far West appeals both the denial of its summary-judgment motion and the grant of appellee's summary-judgment motion. Because we conclude that appellee failed to prove that no issues of material fact exist and failed to prove that it was entitled to summary judgment as a matter of law, we reverse the district court's order granting summary judgment and remand to the district court for further proceedings.

# BACKGROUND

In the early 1980s, appellee Texas Investments Management, Inc. proposed plans to develop a 35.49-acre tract of land in northwest Austin, which was to include several office and commercial buildings, interconnecting roads and sidewalks, and possibly public gathering areas and a jogging trail. While appellee was awaiting approval of its development plans by the City of Austin, Prudential Health Care Plan, Inc. ("Prudential") purchased five acres out of the 35.49-acre tract. The deed of sale to Prudential included restrictive covenants that were attached as an exhibit to the deed. The restrictive covenants provided:

> The following restrictive covenants are created as covenants running with the five acre tract of land described in this Deed ("Said Property"), for the benefit of Grantor [appellee] herein, its successors and assigns in its capacity as developer of that certain thirty-five and 49/100 (35.49) acre tract out of which is hereby conveyed the herein described five acre parcel. The restrictions herein imposed are created for the purpose of establishing a high quality mixed-use office and commercial complex composed of a coordinated series of buildings, roadways, landscaping, pedestrian malls and parking facilities.

The restrictive covenants section included a provision for a maintenance fee to be paid by Prudential and subsequent owners to appellee. This provision provided:

> Maintenance Fee
>
> 1. Grantee [Prudential] and each subsequent owner of Said Property [the five-acre tract] shall pay an annual maintenance fee to Grantor [appellee], for the purpose of providing for the orderly development, operation and maintenance of streets, sidewalks, pedestrian malls and other quasi-public facilities on said 35.49-acre tract, as well as to provide for the operation and maintenance of a proposed jogging trail, necessary security services, insurance, traffic control and architectural review and enforcement for said 35.49-acre development. The maintenance fee for Said Property herein conveyed shall be $.20 per gross

2

square foot of building space per year commencing with the initial occupancy of said space. . . . Commencing with January 1, 1983 and thereafter on January 1 of each following year, the maintenance fee shall be adjusted to reflect any increase in the Consumer Price Index ("CPI") from the base year of 1981. . . . Grantor shall provide Grantee annually with a written report disclosing all expenditures made by Grantor out of the maintenance fee fund.

Prudential's purchase of the five-acre tract was completed while appellee was awaiting approval of its development plan by the City of Austin, which, in fact, never approved the plan. Despite the City of Austin's failure to approve appellee's master-development plan, Prudential commenced payment of the annual maintenance fee to appellee in 1983 and continued payment until 1998, when Prudential sold the property to Texas HCP Holdings, Inc. ("THCP"). THCP continued paying the maintenance fees until it sold the property to appellant TX Far West in July 2001.

In November 2001, Richard Kemp, the president of TX Far West's corporate general partner, received the billing for the 2002 maintenance fee. Kemp requested a written report itemizing the services being rendered in exchange for payment of the maintenance fee. This request was consistent with the deed requirement that "Grantor shall provide Grantee annually with a written report disclosing all expenditures made by Grantor out of the maintenance fee fund." According to Kemp, Jay Tapp, appellee's president, responded "it is none of your [expletive] business."

After various correspondence between the parties regarding appellee's expenditures, TX Far West filed a declaratory-judgment action seeking a determination that appellee had violated the terms of the restrictive covenant due to its failure to provide the amenities specified therein. TX Far West argued that, because it was paying the maintenance fee, it was entitled to receive the benefits provided for in the language of the restrictive covenant, namely, amenities on the 35.49-acre

3

tract. In the alternative, TX Far West alleged that the maintenance-fee covenant was a personal covenant only and did not run with the land.

Appellee responded with a counterclaim for breach of contract and its own declaratory-judgment action. Appellee admitted that, for some or all of the years in question, it had not provided streets, sidewalks, pedestrian malls, or other quasi-public facilities on the 35.49-acre tract, nor had it provided a jogging trail, security services, insurance, or traffic control for the 35.49-acre development. However, appellee did build an 80-foot roadway to access the five-acre tract and has been mowing a strip of grass on the median of that roadway. Appellee claimed that the maintenance fee was not conditioned on the construction of additional amenities. Moreover, appellee argued that the maintenance fee was, in essence, actually a financing arrangement that had been negotiated by Prudential. In his affidavit, Jay Tapp stated:

> As president of [appellee], I was involved in negotiating with Prudential about the sale of the five-acre Property. In negotiating with Prudential, I was informed that [appellee]'s asking price was more than Prudential had available in its budget. I also was informed, however, that Prudential was willing to pay a lower price for the land with an additional amount to be paid to [appellee] as a guaranteed annual maintenance fee for a period of fifty years (the "Maintenance Fee"). [Appellee] (through me) and Prudential (through its Vice President, Paul McCarty, now deceased) agreed the amount due each year for the Maintenance Fee would be determined by a mathematical calculation based solely on the square footage of building space on the property and the consumer price index, and not the amount of maintenance expenses incurred in a particular year.
>
> [Appellee] agreed to accept the lower purchase price based, in part, on an analysis that the Maintenance Fee payments would likely exceed actual maintenance costs and much of the price [appellee] had initially sought for the Property could be recovered during the 50-year agreement.

4

Furthermore, appellee claimed that the development plans initially called for appellee to construct a 30-foot roadway. Because Prudential desired a larger roadway, appellee constructed an 80-foot roadway[1] that allegedly cost $138,144.72 more than the 30-foot roadway originally called for in the development plans. According to appellee, this expanded roadway was the only amenity that Prudential desired. Although the maintenance fee is far greater than current maintenance expenditures,[2] appellee claims it has failed to recover more than $430,000 of its maintenance expenses when a six-percent interest rate is applied to appellee's initial expenditure.

Both parties filed traditional motions for summary judgment. In its motion, TX Far West argued that because it was paying the maintenance fee and incurring the burden of the restrictive covenant, it was entitled to the benefits provided by the language of the restrictive covenant as well. TX Far West also contended that payment of the maintenance fee was conditioned upon appellee providing the amenities called for in the restrictive covenant. Conversely, appellees argued in its summary-judgment motion that construction of the 80-foot roadway constitutes "development" of the 35.49-acre tract, the amenities mentioned in the restrictive covenant were entirely optional, and appellee's "only obligation included in the language of the Restrictive Covenant [was] to maintain and provide security and insurance for any streets, sidewalks, and public amenities it chooses to construct on the Property." Appellee also presented its argument that the true

[1] This roadway, now known as Austin Center Boulevard, was later dedicated to the City of Austin as a public right-of-way. Appellee admits that, because the City of Austin maintains the roadway, appellee does not maintain any streets on the 35.49-acre tract.

[2] The district court determined the maintenance fee to be $17,697.56 in 2002 and $18,174.91 in 2003. Appellee expends approximately $4,320 per year for maintaining the median on Austin Center Boulevard.

intent of the maintenance fee was to function as a deferred compensation financing arrangement to compensate for a lower initial price paid by Prudential. The trial court denied TX Far West's summary-judgment motion, granted appellee's summary-judgment motion, and stated that "the payment of this maintenance fee is not conditioned on additional amenities being added to the property, but is solely conditioned on the maintenance of the grass median currently existing in the center of Austin Center Blvd. . . ."

On appeal, TX Far West argues that, because the 35.49-acre tract was not developed as called for in the restrictive covenant, the restrictive covenant should not be enforced because (1) the purpose of the restrictive covenant has been frustrated; (2) there has been such a change in conditions that it is no longer possible to secure to a substantial degree the benefits sought to be realized from the restrictive covenant; and (3) the mutuality of obligation central to the purpose of the restrictive covenant is absent.

Appellee responds on appeal that the district court's grant of summary judgment for appellee should be affirmed because (1) TX Far West's arguments that the restrictive covenant is unenforceable are waived because these arguments were not before the trial court in the summary-judgment proceeding; (2) no language in the restrictive covenant requires appellee to construct additional amenities; (3) the continued payment of the maintenance fee by previous owners constitutes a waiver of TX Far West's right to enforce the restrictive covenant and require appellee to build additional amenities; (4) TX Far West has judicially admitted the validity and enforceability of the restrictive covenant; and (5) it would be inequitable to relieve TX Far West of the burden of

6

the restrictive covenant due to the large initial expenditure appellee incurred in building the 80-foot roadway.

**STANDARD OF REVIEW**

The standards for reviewing a traditional summary-judgment motion are well established: (1) the summary-judgment movant has the burden of showing that there is no issue of material fact and that it is entitled to judgment as a matter of law; (2) in deciding if there is a disputed issue of material fact precluding summary judgment, evidence favorable to the non-movant will be taken as true; and (3) every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985). When both parties move for summary judgment, each party must carry its own burden as the movant. *Tigner v. First Nat'l Bank of Angleton*, 264 S.W.2d 85, 87 (Tex. 1954); *Jun v. Lloyds & Other Various Insurers*, 37 S.W.3d 59, 62 (Tex. App.—Austin 2000, pet. denied). When the district court grants one party's motion and denies the other's, the reviewing court should determine all questions presented and render the judgment that the court below should have rendered. *Commissioners Court v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997); *City of Fort Worth v. Cornyn*, 86 S.W.3d 320, 322 (Tex. App.—Austin 2002, no pet.).

On appeal, all reasonable inferences will be indulged, and all doubts will be resolved in favor of the losing party. *University of Tex. Health Sci. Ctr. v. Big Train Carpet, Inc.*, 739 S.W.2d 792, 792 (Tex. 1987). The propriety of summary judgment is a question of law; therefore, we review the trial court's decision *de novo*. *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994). "When a trial court's order granting summary judgment does not specify the ground or grounds

7

relied on for its ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious." *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989). If we find inconsistencies in the summary-judgment evidence that raise an issue of material fact, we must reverse the summary judgment and remand to the trial court. *Hinojosa v. Columbia/St. David's Healthcare Sys., L.P.*, 106 S.W.3d 380, 384 (Tex. App.—Austin 2002, no pet.).

## ANALYSIS

### *Appellee's Summary-Judgment Motion*

Appellee argued that it was entitled to declaratory relief and summary judgment on its breach-of-contract claim on four grounds: (1) the language of the restrictive covenant; (2) the intent of the parties and the consistent interpretation and performance of the restrictive covenant in previous years; (3) intentional waiver of the right to enforce alleged obligations; and (4) equity and good conscience. Because we will affirm the summary judgment if any of these theories are meritorious, *see Carr*, 776 S.W.2d at 569, we will address each argument in turn. First, however, we must outline some of the principles of restrictive covenants.

Appellee focuses much of its appellate efforts on whether TX Far West has waived the right to contest the validity of the restrictive covenant. However, this overlooks the well-established rule that a traditional summary-judgment movant must prove that it is entitled to judgment as a matter of law. *Nixon*, 690 S.W.2d at 548. If a defendant establishes a right to judgment as a matter of law, the burden then shifts to the plaintiff to raise a fact issue precluding summary judgment. *Curtis v. Anderson*, 106 S.W.3d 251, 253 (Tex. App.—Austin 2003, pet. denied).

8

In order for appellee to be entitled to summary judgment, appellee had to show that the restrictive covenant was binding on TX Far West as a successor to Prudential. A restrictive covenant can bind a successor to the burdened land in two ways: as a covenant that runs with the land at law, or as an equitable servitude.[3] *Reagan Nat'l Adver. of Austin, Inc. v. Capital Outdoors, Inc.*, 96 S.W.3d 490, 495 (Tex. App.—Austin 2002, pet. granted, judgm't vacated w.r.m.). In Texas, a covenant runs with the land when (1) it touches and concerns the land; (2) it relates to a thing in existence or specifically binds the parties and their assigns; (3) the original parties to the covenant intend it to run with the land; and (4) the successor to the burden has notice. *Inwood North Homeowners' Ass'n v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987). In addition to these fundamental requirements, section 202.003(a) of the Texas Property Code states that "a restrictive covenant shall be liberally construed to give effect to its purposes and intent." Tex. Prop. Code Ann. § 202.003(a) (West 1995).

### (1) The Language of the Restrictive Covenant

Having outlined the requirements for a restrictive covenant to run with the land, and having reviewed the entire summary-judgment record, we now look to the language of the restrictive covenant to determine its meaning and whether it runs with the land. Restrictive covenants are subject to the same rules of construction and interpretation as contracts. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998). The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *See National Union Fire Ins.*

---

[3] Neither party argues that the restrictive covenant is actually an equitable servitude.

9

*Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).  For a court to be able to construe a contract as a matter of law, the contract must be unambiguous.  *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).  If a written contract is so worded that it can be given a definite or certain legal meaning, then it is unambiguous.  *See National Union*, 907 S.W.2d at 520; *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983).  On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent.  *See Columbia Gas*, 940 S.W.2d at 589.

Appellee argues that it is entitled to judgment as a matter of law because courts should construe the parties' rights under an unambiguous contract in accordance with the language of the contract contained within the "four corners" of the document.  Although appellee cites *French v. Chevron U.S.A., Inc.*, 896 S.W.2d 795, 797 (Tex. 1995), for this proposition, *French* also states that "the 'four corners' canon of construction means that the court must look at the entire instrument to ascertain the intent of the parties." *Id.* (citing *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991)). Appellee focuses on the language in the restrictive covenant that states that the restrictive covenants are created "for the benefit of Grantor herein."  Appellee also argues that no language requires appellee to build *any* amenities on the 35.49-acre tract, and that the *only* obligation the restrictive covenant imposes on appellee is to "maintain and provide security and insurance for any streets, sidewalks, and public amenities it chooses to construct on the Property."

TX Far West, however, focuses on language in the restrictive covenant that states that the restrictive covenants were "*created for the purpose of* establishing a high quality mixed-use

10

office and commercial complex composed of a coordinated series of buildings, roadways, landscaping, pedestrian malls and parking facilities." (Emphasis added.) Moreover, TX Far West argues that the complete language of the restrictive covenants states that they were imposed "for the benefit of Grantor herein, its successors and assigns *in its capacity as developer of that certain thirty-five and 49/100 (35.49) acre tract* out of which is hereby conveyed the herein described five acre parcel." (Emphasis added.) TX Far West argues that, because the 35.49-acre tract was never developed, appellee has breached its obligations under the restrictive covenant, or, in the alternative, the restrictive covenant is not enforceable.

Appellee responds that it did, in fact, develop the 35.49-acre tract. Although its master-development plans were never approved by the City of Austin, appellee argues that construction of a roadway on the five-acre tract constitutes development of the 35.49-acre tract because the five-acre tract is a part of the larger 35.49-acre tract.

TX Far West and appellee have presented differing interpretations of the restrictive covenant, both of which are reasonable. Because the language of the restrictive covenant cannot be given a definite or certain legal meaning—especially the meaning of the language "in [appellee's] capacity as developer of that certain thirty-five and 49/100 (35.49) acre tract"—it is ambiguous and therefore creates a fact issue on the parties' intent. *See Columbia Gas*, 940 S.W.2d at 589. We therefore hold that, because the ambiguous language of the restrictive covenant cannot establish whether the original parties intended it to run with the land when the 35.49-acre tract was not fully developed, the language of the restrictive covenant alone is insufficient to support the district court's summary judgment.

11

## (2) *Intent of the Original Parties and Purpose of the Restrictive Covenant*

Having determined that the language of the restrictive covenant is ambiguous, we turn to the intent of the original parties and to the purpose of the covenant to determine whether this restrictive covenant runs with the land. Although appellee contends that it and Prudential intended the maintenance fee to be, in essence, a financing arrangement in exchange for a lower purchase price, our review of the summary-judgment record reveals a conflict as to this assertion.[4] Included in the summary-judgment record is an affidavit of Edwin Maurice (Mo) Keathley, a former vice president at Prudential. According to Keathley's affidavit, Tapp sent Keathley an affidavit to execute on Tapp's behalf and indicated to Keathley that attorneys might contact Keathley. Keathley responded that "if [lawyers] did [contact him], [his] recollections did not support the position as set forth in the proposed Affidavit submitted by Mr. Tapp." Specifically, Keathley's affidavit states:

> 4. I am a former Vice-President at Prudential Health Care, Inc. I was Vice-President at [Prudential] on March 26, 1981, the date that the property [in question] was purchased from [appellee] and at all times during the negotiation of said price. I was aware of the property purchase negotiations at that time, including the price that was paid and the amenities that were to be provided by the seller of the land pursuant to the Restrictive Covenant, due to my position at [Prudential], my participation in corporate meetings, and my review of documents during the negotiation and consummation of the purchase. Based on my recollection of the transaction and the events and discussions surrounding same, it was clear that [Prudential] believed that it was paying fair market price for the real property in question. There was no belief by me that [Prudential] was getting a below market deal on the property.

---

[4] Appellee's assertions are based largely on the affidavit of Jay Tapp. In appellee's summary-judgment motion, of the sixty-two footnotes that cite appellee's attached summary judgment evidence, forty-four reference Tapp's affidavit. Tapp's affidavit is based largely on his recollection of Prudential's intent, but the only person at Prudential whom Tapp specifically names, Paul McCarty, is now deceased.

5. Based on my position at [Prudential] I was aware of the transaction between [Prudential] and [appellee] and was aware that Prudential was trying to purchase the property. I am aware of no discussion internally, or with Mr. Tapp, that the price being paid for the property was too low, or the purchase price for the property was all that [Prudential] could pay. Additionally, I am aware of no discussion or decision on the part of [Prudential] that the maintenance fee obligation in the restrictive covenants would essentially be used to make up any alleged shortage in the purchase price paid for the property. On the contrary, [Prudential] inquired on multiple occasions as to what [appellee] was doing in return for the maintenance fees. After seeking this information for some time, Mr. Tapp finally provided a statement of his expenses, which indicated a great disparity, in [appellee's] favor, between the expenses incurred for maintenance, and the maintenance fee paid to [appellee] pursuant to the restrictive covenant. [Prudential] was never satisfied that it was getting fair value for the fees being paid for the maintenance/services by [appellee].

Appellee asserts on appeal that the statements in Keathley's affidavit "are entirely consistent with Mr. Tapp's affidavit and they cannot be said to 'contradict' the evidence that the maintenance fee was deferred consideration for the sale of the five acres." Appellee supports this position by noting that Keathley's statement that Prudential believed it was paying "the fair market price for the real property in question" is not inconsistent with Mr. Tapp's statement that appellee's "asking" price was more than Prudential had available in its budget.

We disagree. To accept appellee's argument would require us to agree with Mr. Tapp's recollection of *Prudential's* intent and entirely ignore the recollection of an actual Prudential representative with personal knowledge of the transaction that resulted in this litigation. This is precisely the type of fact dispute that should be determined by a trier of fact.

The closing agreement between appellee and Prudential also contradicts appellee's assertion that Prudential did not desire any amenities other than the roadway. This document states that

13

> the jogging trail *shall* be completed within a reasonable period of time . . . and *shall*
> be constructed and completed in a good and workmanlike manner, attractive in
> appearence [sic], and maintained and constructed in such a way that [Prudential's]
> use of, and ingress and egress to and from the [five-acre tract] is in no way hindered.

(Emphasis added.) The use of the word "shall" indicates that the parties, at the least, contemplated that the jogging trail would be built. This contradicts appellee's assertion, supported only by Tapp's affidavit, that Prudential essentially agreed to trade all of the listed amenities in the restrictive covenant for a wider roadway and specifically requested, based on liability concerns, that additional amenities *not* be built.

Appellee's own summary-judgment evidence also contradicts its assertion that Prudential only cared about construction of a roadway and that the maintenance fee was a disguised financing arrangement. A March 9, 1983 letter from Jay Tapp to Prudential[5] reads:

> Since your payment of this fee is an unconditional obligation, I would appreciate your
> prompt processing of our invoice. The initial amount for 1982 was due when you
> first occupied the building, and the amount due for 1983 was due in January.
>
> We are in the process of finalizing our master landscaping plan, including the
> medians, but have been held up by the good City of Austin bureaucracy.
>
> I am sure you can see that we have spent a considerable amount on improving and
> maintaining the appearance of the Austin Center.

Despite appellee's assertions that Prudential was only concerned about construction of the roadway, this letter appears to indicate otherwise. Prudential was evidently requesting an accounting to

---

[5] The letter from Tapp was in response to a Prudential letter dated February 23, 1983. According to Tapp's letter, the Prudential letter "inquir[ed] about the expenditures out of the maintenance fund fee." The Prudential letter is not included in the record.

14

itemize the expenditures from the maintenance-fee fund. If appellee's assertion regarding the actual nature of the maintenance fee is correct—that it was a financing arrangement and Prudential had no interest in development of anything other than a roadway to access the five-acre tract—we see no reason why Prudential would request an itemization of expenses from appellee, nor do we understand why appellee's response would allude to the "good City of Austin bureaucracy" if Prudential had no interest in any developments other than the roadway. Because this letter was written on March 9, 1983, it also contradicts appellee's repeated assertions that the maintenance fees were paid, without objection, since 1981.

Because Keathley's affidavit, the closing agreement, and the March 9, 1983 letter from Jay Tapp to Prudential all contradict appellee's summary-judgment evidence, a material fact issue exists as to the intent of the original parties and the purpose of the restrictive covenant. Appellee has therefore failed to prove as a matter of law that the restrictive covenant runs with the land and is enforceable against TX Far West. We hold that the disputed intent of the parties does not support the district court's summary judgment.

### (3) Intentional Waiver

Appellee, citing *Cowling v. Colligan*, 312 S.W.2d 943, 945 (Tex. 1958), argues that the acquiescence of the previous owners of the five-acre tract to the alleged violations of the restrictive covenant amounts to a waiver of TX Far West's right to enforce the restrictive covenant. Because the restrictive covenant expressly states that "failure by Grantor or Grantee, their successors or assigns, to enforce any covenant, condition or restriction herein contained shall in no event be

15

deemed a waiver of the right to do so thereafter," we disagree with appellee's waiver argument and hold that it is insufficient to support the district court's summary judgment.

*(4) Equity and Good Conscience*

Finally, appellee contends that the equities of the situation warrant a grant of summary judgment in its favor. Appellee argues it has failed to recover more than $430,000 of its maintenance expenses when a six-percent interest rate is applied to appellee's initial expenditure and compounded for more than two decades. In fact, appellee states that even if the maintenance fee is paid until its fifty-year term expires, appellee would *still* not recover the balance of its initial investment.

According to its own arguments, appellee bargained for a maintenance fee it *knew* would not reimburse it for its initial expenditure. Moreover, appellee's equitable argument is inconsistent with its position that the maintenance fee was intended as a deferred-compensation scheme and was *not* intended to compensate for actual maintenance expenses. Because the equitable arguments presented by appellee create at most a fact dispute, we hold that the district court's grant of summary judgment in appellee's favor is not supported by the equities of the situation.

Having overruled all of the grounds appellee presented in its summary-judgment motion, we determine that the district court erred in granting summary judgment to appellee.

*TX Far West's Summary-Judgment Motion*

We turn now to the question of whether the district court's denial of TX Far West's summary-judgment motion was improper. In its summary-judgment motion, TX Far West argues

16

that appellee breached the restrictive covenant and should therefore be ordered to comply with appellee's affirmative duties required therein. In the alternative, TX Far West argues that the restrictive covenant should be modified or terminated. As explained above, the restrictive covenant is ambiguous, and a determination of the obligations imposed on both appellee and TX Far West requires a trier of fact to determine the intent of the original parties and the purpose of the restrictive covenant. Accordingly, the district court did not err in denying TX Far West's summary-judgment motion based upon TX Far West's argument that the restrictive covenant was unambiguous and imposed affirmative duties on appellee. Therefore, we need only address TX Far West's contention that the restrictive covenant is not enforceable.

A court may refuse to enforce a restrictive covenant if there has been such a change of conditions that it is no longer possible to secure in a substantial degree the benefits sought to be realized through the covenant. *Cowling*, 312 S.W.2d at 945; *Dempsey v. Apache Shores Prop. Owners Ass'n*, 737 S.W.2d 589, 597 (Tex. App.—Austin 1987, no writ). Appellee argues that, because TX Far West failed to present this argument to the district court, it is precluded from arguing on appeal that the restrictive covenant is not enforceable. Specifically, appellee asserts, "Nowhere in [TX Far West's] 39-page Response and Counter-Motion for Summary Judgment does [TX Far West] contest the validity of the Restrictive Covenant."

After examining the pleadings and responses of TX Far West, we disagree. TX Far West argued in both its live pleading and in its summary-judgment motion that the restrictive covenant is unenforceable. In its live pleading, TX Far West argued that the restrictive covenant "does not run with the land, but is merely a personal covenant." In its summary-judgment motion,

17

TX Far West argued that "there have been changed conditions . . . [that] consist of the failure of [appellee] to receive approval for the 35 acre development." TX Far West contended that, due to these changed conditions,

> it is no longer possible to secure in a substantial degree the benefits sought to be realized through the covenant, to wit, establishing a high quality mixed-use office and commercial complex composed of a coordinated series of buildings, roadways, landscaping, pedestrian malls and parking facilities. . . . *Cowling* [*v. Colligan*] tends to support TX Far West's contention that the Restrictive Covenant *should be terminated and/or equitably reformed* due to changed conditions which substantially impair the benefit that was to be derived from same.

(Emphasis added.) Because TX Far West argued in both its live pleading and in its summary-judgment motion that the restrictive covenant is unenforceable, we reject appellee's contention that TX Far West waived the right to present this argument on appeal.

Appellee also asserts that statements by Kemp, TX Far West's representative, qualify as judicial admissions and therefore prove the validity of the restrictive covenant as a matter of law. Specifically, Kemp stated in his affidavit:

- I . . . clearly and unequivocally came to the conclusion that the Restrictive Covenant had neither been abandoned nor its enforcement waived. . . .

- I reasonably believed, and still now believe, the Restrictive Covenant is in full force and effect. . . .

- TX Far West, as a bonafide [sic] purchaser, clearly retained all rights to enforce the Restrictive Covenant and the obligations of [appellee] as TX Far West is asserting in this lawsuit.

18

It is well established that "assertions of fact, not pleaded in the alternative, in the live pleadings of a party are regarded as formal judicial admissions." *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001) (quoting *Houston First Am. Sav. v. Musick*, 650 S.W.2d 764, 767 (Tex. 1983)). A judicial admission that is clear and unequivocal has conclusive effect and bars the admitting party from later disputing the admitted fact. *Id.*; *Gevinson v. Manhattan Constr. Co.*, 449 S.W.2d 458, 467 (Tex. 1969).

Here, however, we disagree for several reasons that these statements prove the validity of the restrictive covenant as a matter of law. First, Kemp's statements that the restrictive covenant is enforceable are made in support of TX Far West's argument that, because TX Far West is incurring the burden of the maintenance fee, it is entitled to force appellee to provide the concomitant benefits. This in no way prevents TX Far West from pleading, in the alternative, that the restrictive covenant is unenforceable due to changed conditions, frustration of purpose, or lack of mutuality of obligations. Kemp's statements also do not foreclose TX Far West from arguing, in the alternative, that the restrictive covenant was a personal covenant that does not run with the land.

Second, appellee cites *Mendoza v. Fidelity & Guaranty Insurance Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980), for the proposition that Kemp's "judicial admissions" now bar TX Far West from taking an inconsistent position. However, *Mendoza* dealt with testimonial declarations, which are quasi-admissions only, as opposed to pleading declarations, which can be "true judicial admissions." *See id.* Kemp's declarations are testimonial and are, at most, quasi-admissions. *See id.*

19

Finally, even if we were to accept appellee's argument that Kemp's statements qualify as judicial admissions, they do not constitute conclusive evidence supporting summary judgment. Kemp's statements are statements only as to what Kemp *believes* to be true. Furthermore, Kemp's testimony reveals his *opinion* on the legal enforceability of the restrictive covenant. When an affiant states legal conclusions and fails to state facts regarding the pertinent issues, the affidavit cannot support summary judgment as a matter or law. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996); *Hidalgo v. Surety Sav. & Loan Ass'n*, 487 S.W.2d 702, 703 (Tex. 1972); *FFNS, Ltd. v. Security State Bank & Trust*, 63 S.W.3d 546, 550 (Tex. App.—Austin 2001, pet. denied). Therefore, we reject appellee's assertion that Kemp's statements are judicial admissions that prove the validity of the restrictive covenant as a matter of law.

However, resolution of TX Far West's contention that appellee breached the restrictive covenant by failing to provide certain amenities requires a factual determination of both the intent of the original parties and the purpose of the restrictive covenant. Similarly, determining whether the restrictive covenant should not be enforced due to frustration of purpose, changed conditions, or lack of mutuality of obligations requires a trier of fact to make the same determinations. We therefore hold that the district court did not err in denying TX Far West's summary-judgment motion based on these grounds.

Finally, TX Far West argues that because the amount of the maintenance fee ($17,697.56 in 2002 and $18,174.91 in 2003) greatly exceeds the amount of services rendered by appellee (approximately $4,320 per year for maintaining the median on Austin Center Boulevard), the restrictive covenant should not be enforced due to equitable principles such as unjust enrichment.

20

However, these equitable arguments lose much of their merit if the maintenance fee is, as appellee argues, a financing arrangement that runs with the land. Because the true nature of the maintenance fee requires an examination of the intent of the original parties to the covenant as well as a determination of the purpose of the restrictive covenant, TX Far West's equitable arguments are insufficient to support summary judgment in its favor. Having overruled all of TX Far West's arguments in support of its summary-judgment motion, we hold that the district court's denial of TX Far West's summary-judgment motion was proper.

## CONCLUSION

Having concluded that the existence of material fact issues regarding the intent of the parties prevents the granting of summary judgment for either party, we reverse the district court's grant of summary judgment to appellee and remand this cause for further proceedings.


_____

Mack Kidd, Justice

Before Chief Justice Law, Justices Kidd and Puryear

Reversed and Remanded

Filed: January 15, 2004

21