# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00453-CV

**Gilbert Limon and Martha Limon, Individually, and d/b/a Limon Hauling Co., Appellants**

**v.**

**J.T.B. Services, Inc., Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
## NO. D-1-GN-00-000466, HONORABLE PETER M. LOWRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellants Gilbert Limon and Martha Limon, individually and d/b/a Limon Hauling Co.,[1] sued appellee J.T.B. Services, Inc. ("J.T.B.") for breach of contract and fraud. J.T.B. filed a motion for summary judgment, which the trial court granted. Limon Hauling appeals, arguing that the trial court erred in granting J.T.B.'s motion for summary judgment and in denying Limon Hauling's counter-motion for summary judgment. Because we hold that J.T.B. established that it was entitled to judgment as a matter of law, we affirm the order of the trial court.

## BACKGROUND

J.T.B., a construction and demolition contractor, submitted a bid to the City of Austin ("the City") for demolition work at Remediation and Demolition Area 8 within Austin-Bergstrom

---

[1] We will refer to the appellants collectively as "Limon Hauling," except where it is necessary to distinguish among individual appellants.

International Airport ("Area 8"). Prior to submitting its bid, J.T.B. solicited bids from subcontractors for hauling debris from Area 8. Limon Hauling submitted a bid for the subcontract, and J.T.B. used Limon Hauling's bid when submitting its own bid to the City.

As part of its bid, J.T.B. was required to demonstrate compliance with the City's minority-owned and women-owned business enterprises procurement program.[2] J.T.B. submitted a DBE Goal Compliance Plan detailing what percentage of the work on the contract would be subcontracted out to DBEs.[3] J.T.B. listed Limon Hauling as the DBE subcontractor responsible for "transportation and disposal of debris" at a price of $122,408, or 27.3% of the overall contract price.

J.T.B. was awarded the Area 8 project and signed a contract with the City on February 26, 1999 (the "City contract").[4] On March 2, 1999, the director of the City's Small and Minority Business Resources Department sent a letter to Limon Hauling congratulating it on being awarded a subcontract with J.T.B. J.T.B.'s Project Manager, Steve Traina, testified in his deposition that J.T.B. also gave Limon Hauling verbal notice that Limon Hauling had been awarded the subcontract. According to Limon Hauling, it informed J.T.B. that it could start the job immediately. According to J.T.B., Limon Hauling said it did not have the necessary trucks and equipment to perform the work. J.T.B. then hired Pulido & Sons Trucking ("Pulido"), who had also submitted

---

[2] Minority-owned and women-owned businesses are also referred to as disadvantaged business enterprises, or "DBEs."

[3] The DBE program, which is administered by the City's Small and Minority Business Resources Deartment, encourages DBE participation in City contracts by establishing a goal for the percentage of work on any contract that will be completed by a DBE. *See* City of Austin, Small & Minority Bus. Res. Dep't, http://www.ci.austin.tx.us/smbr/default.htm (last visited Mar. 15, 2009); Austin, Tex., Code of Ordinances § 2.9A-19 (2008) (creating procedure for establishing minimum DBE participation levels for construction contracts).

[4] The City signed the contract on March 6, 1999.

a bid but was not a DBE, to perform the hauling work for the Area 8 project.[5] J.T.B. did not request permission from the City to substitute Pulido for Limon Hauling, as required by city ordinance. *See* Austin, Tex., Code of Ordinances § 2.9A-23 (2008) (governing post submission changes to DBE compliance plan).

According to Limon Hauling, when J.T.B. did not contact it about starting the job, Limon Hauling went to the airport job site and discovered that J.T.B. was using Pulido instead. Limon Hauling then filed a complaint with the City's Small and Minority Business Resources Department. On March 25, the City notified J.T.B. that the City contract would be terminated due to J.T.B.'s failure to comply with the DBE compliance plan—by failing to submit a signed letter of intent for each of its DBE subcontractors and by substituting Pulido for Limon Hauling—unless J.T.B. cured the violations within seven days.[6]

After being admonished by the City, J.T.B. negotiated a written contract with Limon Hauling for the "transportation of concrete, asphalt, structural & misc. steel, spoils, base materials,

---

[5] Limon Hauling concedes that it did not own the necessary trucks, but contends that it intended to rent the needed equipment or subcontract out the work. Martha Limon, Limon Hauling's owner, averred in an affidavit in response to J.T.B.'s motion for summary judgment that J.T.B. did not even notify Limon Hauling what type of trucks were necessary to perform the work prior to hiring Pulido.

[6] Specifically, the City stated that J.T.B. had failed to:

(1) Submit signed and notarized letters of intent (LOI) between you and each of your DBE Subcontractors within seven (7) business days upon notification of status as certified low bidder, and

(2) Obtain consent of the DBE Liaison Officer and Director of the Small and Minority Business Resources Department for changes to the DBE Goal Complinace Plan, including substitutions or addition of DBE subcontractors, prior to start of work. In particular, you substituted Pulido Trucking for G. Limon Hauling without the prior approval of the City.

and general demolition debris" ("the Limon subcontract"). The Limon subcontract stated that Limon Hauling would "serve as the sole transporter for, subcontract, off-site transportation associated with" the Area 8 project. Limon Hauling was to be paid $57.50 per hour for trucking services, plus $10 per load for recyclable materials not transported by Limon Hauling. J.T.B. and Limon Hauling signed the Limon subcontract on March 30, 1999. The next day, they signed the Letter of Intent (LOI) required by the City, which stated that:

> The Prime Concessionaire [J.T.B.] and the DBE listed above [Limon Hauling] hereby agree that upon the execution of a contract for the above-named project between the Prime Concessionaire and the City of Austin, entering into a contract, the DBE will perform the scope of work for the price indicated above.

The "price indicated above" was a lump sum of $122,400.00. The same day that Limon Hauling signed the LOI, it signed a subcontract with Pulido ("the Pulido subcontract"), under which Pulido would perform all of Limon Hauling's duties under the Limon subcontract. Limon Hauling was to pay Pulido $50.00 an hour.

In February of 2000, Limon Hauling filed suit against J.T.B. for breach of contract and fraud and against Pulido for breach of contract, tortious interference with a contract, and fraud.[7] Limon Hauling alleged that J.T.B. continued to use Pulido and pay them directly after signing the Limon subcontract on March 30 and that it did not pay Limon Hauling all that it was owed under the Limon subcontract. In July 2004, Pulido and J.T.B. both filed motions for summary judgment, arguing that the only work that Pulido did for J.T.B. after March 31 was outside the scope of the

---

[7] Limon Hauling also initially filed suit against the City and against National American Insurance Company as the surety for J.T.B. The claims against these two defendants were dismissed and are not at issue in this appeal.

4

Limon subcontract.[8]  Limon Hauling counter-claimed for summary judgment on its claims and asserted a new theory of breach—that J.T.B. owed a contractual duty to Limon Hauling before the Limon subcontract was signed and that J.T.B.'s initial hiring of Pulido was a breach of that duty. After a hearing, the trial court granted Pulido's motion for summary judgment in September 2004, but failed to rule on J.T.B.'s motion.  Almost a year later, in August 2005, the trial court granted J.T.B.'s motion for summary judgment and denied Limon Hauling's counter-motion for summary judgment.[9]

Limon Hauling now appeals the trial court's order granting summary judgment in favor of J.T.B. and denying Limon Hauling's motion for summary judgment.  Limon Hauling contends that J.T.B. failed to conclusively prove it was entitled to judgment as a matter of law.[10]

---

[8] Pulido filed both traditional and no-evidence summary judgment motions. *See* Tex. R. Civ. P. 166a(c), (i). J.T.B. filed a traditional summary judgment motion only. *See id.* 166a(c).

[9] Limon Hauling states in its brief to this Court that the trial court's "ruling failed to mention or rule on Appellant's Counter-Claim for Summary-Judgment which was heard the same day and therefore did not dispose of all issues regarding the case."  However, the trial court's order granting summary judgment in favor of J.T.B. stated that "all claims asserted by plaintiffs against J.T.B. Services, Inc., are denied . . . ."  We will treat Limon Hauling's arguments to this Court about why the trial court should have acted on and granted its motion for summary judgment as an appeal of the trial court's denial of Limon Hauling's motion for summary judgment.

[10] Limon Hauling also suggests that the trial court acted improperly when it granted J.T.B.'s motion for summary judgment, pointing to the length of time between the hearing on summary judgment and the court's ruling, the fact that the case was set on the jury docket before summary judgment was granted, and the fact that counsel for J.T.B. sent a letter to the trial court requesting a ruling on the motion which Limon Hauling's counsel did not receive because J.T.B.'s counsel mailed it to the wrong address.  Limon Hauling does not cite to any authority to support its contention that these facts support an inference of impropriety. *See* Tex. R. App. P. 38.1(i) (requiring appellant's briefs to include "appropriate citations to authorities and to the record").  We do not believe these facts support such an inference, and we find nothing in the record to support Limon Hauling's allegation.

## STANDARD OF REVIEW

When a defendant files a traditional motion for summary judgment, it must either: (1) conclusively disprove at least one element of each of the plaintiff's theories of recovery, or (2) plead and conclusively establish each essential element of an affirmative defense, thereby rebutting the plaintiff's cause of action. *See* Tex. R. Civ. P. 166a; *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995); *Holmstrom v. Lee*, 26 S.W.3d 526, 530 (Tex. App.—Austin 2000, no pet.). If the defendant's motion and summary-judgment proof facially establish the right to judgment as a matter of law, the burden shifts to the non-movant plaintiff to raise a material fact issue sufficient to defeat summary judgment. *Centeq Realty*, 899 S.W.2d 195 at 197; *Holmstrom*, 26 S.W.3d at 530. When a plaintiff files a summary judgment motion, it must conclusively establish all elements of its cause of action. *See* Tex. R. Civ. P. 166a; *Myrad Props. v. LaSalle Bank Nat'l Ass'n*, 252 S.W.3d 605, 615 (Tex. App.—Austin 2008, pet. granted); *Hutson v. Tri-County Props., LLC*, 240 S.W.3d 484, 487 (Tex. App.—Fort Worth 2007, pet. denied). A matter is conclusively established if reasonable minds could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005); *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446 (Tex. 1982); *Ling v. BDA&K Bus. Servs., Inc.*, 261 S.W.3d 341, 345 (Tex. App.—Dallas 2008, no pet.).

Because the propriety of summary judgment is a matter of law, we review the trial court's decision de novo. *Valance Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). We take as true all evidence favorable to the non-movant and indulge every reasonable inference and resolve any doubts in the non-movant's favor. *TX Far W., Ltd. v. Texas Invs. Mgmt.*, 127 S.W.3d 295, 301 (Tex. App.—Austin 2004, no pet.) (citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546,

6

548-49 (Tex. 1985)). When, as here, the trial court granted one party's motion and denied the other's, "the reviewing court should determine all questions presented and render the judgment that the court below should have rendered." *Id.*

## DISCUSSION

**Breach of Contract**

To recover on a breach of contract claim, Limon Hauling must show: (1) a valid contract existed; (2) Limon Hauling performed or tendered performance; (3) J.T.B. breached the contract; and (4) Limon Hauling sustained injury as a result of the breach. *See New York Life Ins. Co. v. Miller*, 114 S.W.3d 114, 121 (Tex. App.—Austin 2003, no pet.). J.T.B. argued in its motion for summary judgment that it could conclusively disprove the third element—that it breached the contract.[11] *See Centeq Realty*, 899 S.W.2d at 197 (defendant prevails on summary judgment by conclusively disproving at least one essential element of cause of action). On appeal, Limon Hauling alleges three different theories of breach—that J.T.B. breached the contract when it initially hired Pulido after accepting the bid from Limon Hauling, when it continued to use Pulido after signing the March 30 subcontract, and when it paid Limon Hauling less than the $122,400 listed in the LOI. We examine each in turn.

---

[11] On appeal, J.T.B. also argues that Limon Hauling presented no evidence on the damages claim. However, J.T.B. did not file a no-evidence summary judgment motion with the trial court, *see* Tex. R. Civ. P. 166a(i), and did not attempt to conclusively disprove damages below. Therefore, we will only consider the grounds that J.T.B. raised in its summary judgment motion—that it could conclusively disprove the breach element. *Id.* at 166a(c) (requiring summary judgment motions to state the specific grounds on which judgment is sought and instructing appellate courts to only consider issues "expressly presented to the trial court by written motion").

7

*Pre-March 31 Use of Pulido*

J.T.B.'s motion for summary judgment rested on its contention that the only contract in existence between itself and Limon Hauling was the Limon subcontract that was signed on March 30, 1999. Indeed, J.T.B. contends that this is the only contract Limon Hauling pleaded and that Limon Hauling's only pleaded allegations of breach were related to J.T.B.'s payments to Pulido for work performed after March 31. Limon Hauling, on the other hand, argues that it pleaded that a contract existed as of February 26, 1999, and that J.T.B. breached this contract when it initially hired Pulido to work on the Area 8 project. Limon Hauling contends that J.T.B.'s failure to address these allegations in the motion for summary judgment means that J.T.B.'s motion must fail. *See* Tex. R. Civ. P. 166a(c) (requiring a motion for summary judgment to "state the specific grounds therefor"). The question presented, therefore, is whether Limon Hauling's pleading can be read to include a claim that J.T.B. breached by using Pulido prior to the signing of the March 30 Limon subcontract.

We construe the pleadings liberally in favor of Limon Hauling, the party against whom summary judgment is sought. *See TX Far W.*, 127 S.W.3d at 301 (courts should indulge every reasonable inference in favor of non-movant); *Suprise v. Decock*, 84 S.W.3d 378, 380 (Tex. App.—Corpus Christi 2002, no pet.) (courts should liberally construe pleadings in favor of party against whom summary judgment is sought); *see also Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982) (courts should construe pleadings liberally in favor of pleader). We look to the pleader's intent and uphold the pleading "even if some element of a cause of action has not been specifically alleged. Every fact will be supplied that can reasonably be inferred from what is specifically stated." *Roark*, 633 S.W.2d at 809 (quoting *Gulf, Colo. & Santa Fe Ry. Co. v. Bliss*,

8

368 S.W.2d 594, 599 (Tex. 1963)); *see also Rivero v. Blue Keel Funding, L.L.C.*, 127 S.W.3d 421, 424 (Tex. App.—Dallas 2004, no pet.). Nonetheless, pleadings must give reasonable notice of the claims asserted. *See* Tex. R. Civ. P. 47(a); *Smithkline Beecham Corp. v. Doe*, 903 S.W.2d 347, 354 (Tex. 1995); *Rivero v. Blue Keel Funding, L.L.C.*, 127 S.W.3d 421, 424 (Tex. App.—Dallas 2004, no pet.).

Limon Hauling's second amended pleading, the live pleading at the time summary judgment was granted, cannot reasonably be read to include an allegation that a contract existed between Limon Hauling and J.T.B. before the Limon subcontract was signed on March 30 and that J.T.B. breached this contract when it initially hired Pulido. In fact, Limon Hauling's pleaded facts specifically note that, "[o]nly *after receiving the warning [from the City]* did Defendant JTB agree to sign a Letter of Intent and finalize a contract with Plaintiffs for them to handle all of the hauling work on the airport project" (emphasis added). While Limon Hauling's pleaded facts do mention that J.T.B. initially hired Pulido, Limon Hauling does not refer to this hiring as a breach. In contrast, Limon Hauling pleaded that, "[a]fter March 31, 1999, Defendant JTB knowingly and intentionally violated the terms of the Letter of Intent, the Compliance Plan, the contract with the City of Austin, the contract with Plaintiffs[,] and [the] City of Austin MBE/WBE procurement Program Rules by utilizing and paying Defendant Pulido for hauling work on the airport project." Furthermore, in the section of the petition entitled "First Cause of Action: Breach of Contract Against Defendant JTB and Claim on Performance and Payment Bond," Limon Hauling only states that J.T.B. failed to pay Limon Hauling the full amount due under the Limon subcontract.

Limon Hauling's second amended petition only gives fair notice that Limon Hauling is alleging a breach of the subcontract signed on March 30. Because Limon Hauling did not plead

a contract or breach prior to that date, J.T.B. was not required to disprove an earlier, unplead breach in order to prove that it was entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 47(a); *Smithkline Beecham*, 903 S.W.2d at 354.

*Post-March 31 Use of Pulido*

Limon Hauling alleges that J.T.B. continued to use Pulido after signing the Limon subcontract, which made Limon Hauling the "sole transporter" of "concrete, asphalt, structural [and] misc. steel, spoils, base materials, and general debris" from the Area 8 project. J.T.B. concedes that if it continued to use Pulido and paid Pulido directly for hauling material from the Area 8 project site, then it breached the contract. J.T.B. also acknowledges that it made approximately $33,700 in payments to Pulido for work performed after March 31; however, J.T.B. contends that all of this work was outside the scope of the Limon subcontract and therefore not a breach of that contract.[12] Specifically, J.T.B. asserts that the payments it made to Pulido after March 31 were: reimbursement for dump-site fees; reimbursement for payment to a third-party contractor who hauled hazardous waste from the Area 8 project site; and hauling work that Pulido performed pursuant to a different project. Limon Hauling does not contest J.T.B.'s characterization of the various payments; rather, Limon Hauling contends that the disposal fee reimbursement and the hauling work were in fact within the scope of the Limon subcontract.

According to J.T.B., $7,289 of the $33,700 that it paid Pulido was a reimbursement for disposal fees that Pulido had to pay at the disposal site when Pulido dumped the debris it hauled

---

[12] J.T.B. also paid Pulido $13,123.06 for the hauling work that Pulido performed before March 31, for a total of $46,826.49.

under Pulido's subcontract with Limon Hauling. In support of this contention, J.T.B. introduced affidavits from Nellie Pulido, Pulido's bookkeeper, and Jim Bulgier, J.T.B.'s president. J.T.B. also introduced invoices that it received from Pulido which list $6,704 worth of disposal fee charges incurred between April 27 and June 17, 1999, plus $585 in handling fees and finance charges.[13]

Limon Hauling contends that, because Pulido was Limon Hauling's subcontractor, any reimbursement for disposal fees should have flowed through Limon Hauling and that J.T.B. breached the Limon subcontract when it made the payments directly to Pulido. J.T.B. counters that the disposal fees were outside the scope of the Limon subcontract. The question presented, therefore, is whether disposal fees are within the scope of the work as described in the Limon subcontract:

> Transportation of concrete, asphalt, structural & misc. steel, spoils, base materials, and general demolition debris to locations as designated by contractor.
>
> Vehicle type shall be trailer end-dump type capable of safely transporting 20-30 cubic yards of materials as specified above.
>
> Subcontractor is responsible for all fuel, road taxes, permits, maintenance, and repairs for equipment required to perform this scope of work.

Courts enforce an unambiguous contract as written. *See Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005); *Evergreen Nat'l Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676 (Tex. App.—Austin 2003, no pet.) ("Only the terms of the contract should be consulted when interpreting an unambiguous contract provision."). The Limon subcontract unambiguously does not

---

[13] Ms. Pulido averred in her affidavit that the Pulido invoices were true and accurate copies and represented a true and accurate explanation of all payments Pulido received from J.T.B.

include disposal fees. Therefore, J.T.B. conclusively proved that it did not breach the Limon subcontract when it reimbursed Pulido for the disposal fees.

J.T.B. next notes that it paid Pulido $7,745 to haul materials from the airport to "McMorris Ranch," where J.T.B. was building a dam, and that this work was outside the scope of the Limon subcontract. Because the Limon subcontract states that Limon Hauling "is to act as sole transporter for, subcontract, off-site transportation associated with" the Area 8 project, in order to conclusively prove that these payments were outside the scope of the Limon subcontract, J.T.B. needed to conclusively prove that this hauling work was unrelated to the Area 8 project.

J.T.B. supported its claim that the McMorris Ranch job was outside the scope of the Limon subcontract with the affidavit of Ms. Pulido who averred, "JTB also hired Pulido to transport materials from the airport to a site where a dam was being built for McMorris. Pulido received approximately $7,745.46 for its work on this job, which is completely unrelated to the Project."[14] Attached to Ms. Pulido's affidavits were copies of Pulido's invoices for this hauling work. One of the invoices lists $6,435 in charges for a "haul off" for the "airport to dam job." Another invoice lists $320.46 in charges for hauling materials from "dam job to Texas Disposal Systems." The affidavit also included a spreadsheet which Ms. Pulido averred contained a true and accurate explanation of all payments from J.T.B. to Pulido. This table includes the payments J.T.B. made to Pulido for its hauling work prior to the signing of the Limon subcontract, the reimbursement for dump fees, the payments to the third-party hazardous waste hauler, and the payments for the

---

[14] J.T.B. also introduced the affidavit of Jim Bulgier, who averred, "JTB also hired Pulido to transport materials from the airport to a site where a dam for McMorris [sic]. Pulido received $7,745.46 for its work on the McMorris job. This work was outside the scope of the JTB Contract with Limon."

McMorris Ranch job, which are described as "not related to Bergstrom Area 8." Taken together, this evidence is sufficient to prove that the work that Pulido performed hauling materials to McMorris Ranch was outside the scope of the Limon subcontract, which only covered the Area 8 project.

Next, J.T.B. asserts that $18,669 of the $33,700 in payments to Pulido were reimbursements for payments Pulido made to a third-party contractor for hauling hazardous materials. J.T.B. supported this assertion with affidavits by Jim Bulgier, J.T.B.'s president, and Nellie Pulido, Pulido's bookkeeper. The Limon subcontract does not list hazardous waste materials among the material that Limon Hauling was to haul from Area 8. *See Tittizer*, 171 S.W.3d at 860 (unambiguous contract enforced as written); *Evergreen Nat'l Indem. Co.*, 111 S.W.3d at 676 (same). Limon Hauling did not contest J.T.B.'s evidence regarding this payment or argue that such a payment would violate the Limon subcontract in the response to J.T.B.'s summary judgment motion and does not do so on appeal. Therefore, J.T.B. conclusively proved that the payments for hazardous waste disposal were outside the scope of the Limon subcontract.

Because J.T.B. presented sufficient evidence to show that all of its payments to Pulido for work after March 31, 1999 were outside the scope of the Limon subcontract, the burden then shifted to Limon Hauling to raise a material issue of fact with regard to the breach element. The only evidence that Limon Hauling introduced in response was an affidavit by Martha Limon, the owner of Limon Hauling. Regarding the dump fees, Ms. Limon averred that Pulido "was my subcontractor and did not have authority to contract or bill J.T.B. for dump fees or any other fees." As we discussed above, we disagree with Ms. Limon's legal conclusion about the scope of the Limon subcontract, which does not include dump fees. *See Mercer v. Daoran Corp.*, 676 S.W.2d 580, 583 (Tex. 1984) ("A legal conclusion in an affidavit is insufficient to raise an issue of fact in response

13

to a motion for summary judgment . . . ."); *Higbie Roth Constr. Co. v. Houston Shell & Concrete*, 1 S.W.3d 808, 812 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (while court must take all factual allegations as true, it is not required to accept as true any legal conclusions stated in pleadings). Regarding the payments for the McMorris Ranch job, Ms. Limon simply avers, "To the best of my knowledge, there were not other projects for hauling." This statement does not contradict J.T.B.'s evidence—it could be true that there was another project unrelated to the Area 8 project and that Ms. Limon was unaware of that project.

J.T.B. facially proved that its payments to Pulido for work performed after March 31 were outside the scope of the Limon subcontract. Limon Hauling failed to raise a material fact issue sufficient to defeat summary judgment. Therefore, we hold that J.T.B. conclusively proved that it was entitled to judgment as a matter of law regarding the breach cause of action that was based on J.T.B.'s post-March 31 use of Pulido.

*Payment Dispute*

J.T.B. paid Limon Hauling $57.50 per hour, for a total of $61,583.75. Limon Hauling alleges that J.T.B. was contractually bound to pay Limon Hauling at least $122,400—the lump sum contained in the LOI that was signed on March 31, 1999. J.T.B. counters that there was no minimum lump sum promised in the Limon subcontract that was signed on March 30, 1999, and that therefore J.T.B. only owes Limon Hauling for the amount of work actually performed. The question for this Court is whether the lump sum contained in the LOI is binding and therefore supercedes the payment provision of the Limon subcontract. We hold that the LOI is not binding and does not supercede the Limon subcontract.

14

In construing a contract, our primary purpose is to enforce the parties' intent as it can objectively be determined from the language of the contract. *See SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005); *GTE Sw., Inc. v. Public Util. Comm'n of Tex.*, 102 S.W.3d 282, 294 (Tex. App.—Austin 2003, pet. dism'd). The LOI provides that J.T.B. and Limon Hauling "upon the execution of a contract between [J.T.B.] and the City of Austin, entering into a contract, [Limon Hauling] will perform the scope of work for the price indicated above." The LOI lists the "Proposed Contract Amount" as $122,400, the "Type of Agreement" as "Lump Sum" and the "Description of work to be performed under Subcontract with DBE" as "Transportation of Construction Debris." The language of the LOI—asking for the "*Proposed* Contract Amount" and referencing the subcontract—indicates that the LOI contemplated a more formal subcontract that would set out the parties' obligations in more detail. (emphasis added.) The language of the Limon subcontract, on the other hand, evidences an intent to be a final and complete expression of the agreement between Limon Hauling and J.T.B. The Limon subcontract contains a detailed description of each party's duties and obligations. It describes the type of materials that will be transported and the type and number of vehicles required, provides the procedure for notifying Limon Hauling what services will be needed each day, and establishes the deadline for J.T.B. to make payments—all of which is absent from the LOI.

Furthermore, when we consider the circumstances surrounding the contract, *see GTE Sw.*, 102 S.W.3d at 295, we see further evidence that the parties did not intend for the LOI to supercede the written contract. The LOI was executed pursuant to the City's DBE program requirements. The City requires its prime contractors to execute LOIs with each of its DBE subcontractors and then file the LOI with the City. The LOIs confirm that the general contractor will

in fact use the DBEs designated in the DBE compliance plan. Generally, LOIs are signed before the more formal contract is negotiated, and are not intended to bind the parties after a more definite and final contract is negotiated. *See Kelly v. Rio Grande Computerland Group*, 128 S.W.3d 759, 767 (Tex. App.—El Paso 2004, no pet.) (noting that terms of letter of intent were not enforceable to extent superceded by language in subsequent contracts). The chronology in this case is different from the norm; the parties had already negotiated and signed a formal performance-based subcontract—which specified that Limon Hauling would be paid per load and when payment was due—before they signed the LOI. Nevertheless, it is clear from the face of the LOI—which contains a "proposed contract amount" for both the City contract and the Limon subcontract and references the "Disadvantaged Business Enterprise Program"—that it was not an agreement to supercede the previously existing subcontract. Rather, the purpose of the LOI was to fulfill J.T.B.'s obligations under the City's DBE program. Indeed, the City's letter to J.T.B. warned that J.T.B. had to file an LOI in order to keep its contract with the City. Limon Hauling argues that the LOI must supercede the Limon subcontract because J.T.B. included the larger, flat fee in its DBE compliance plan in order to reach the DBE percentage goal for the project. However, the Limon subcontract does not contain a requirement that J.T.B. fulfill its obligations under the DBE compliance plan; J.T.B.'s duty to comply with the DBE compliance plan is owed to the City under the City contract, not to Limon Hauling.

We hold that the payment provisions in the Limon subcontract control; therefore, as a matter of law, J.T.B. did not commit a breach of contract by paying the hourly rate in the subcontract rather than the flat fee in the LOI.

J.T.B. conclusively disproved the breach element as asserted in Limon Hauling's second amended petition. Therefore, the trial court's order granting summary judgment in favor of J.T.B. as to the breach of contract claim and denying Limon Hauling's counter-motion for summary judgment as to the same claim was proper; we overrule this issue on appeal.

**Fraud**

To recover on the fraud claim, Limon Hauling must show (1) that J.T.B. made a material representation of fact (2) that was false, (3) knowing or with reckless disregard to whether it was false, (4) with the intention that Limon Hauling rely on the representation, and (5) that Limon Hauling relied upon the representation (6) to its detriment. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997). J.T.B. argued in its motion for summary judgment that it could conclusively disprove the second element, because it could conclusively prove that the representation Limon Hauling cites was not false.[15] *See Centeq Realty*, 899 S.W.2d at 197 (defendant prevails on summary judgment by conclusively disproving at least one essential element of cause of action).

In its petition, Limon Hauling alleged that J.T.B. falsely told Limon Hauling it was to act as the "sole transporter" for the Area 8 project, knowing "this was a false statement since [J.T.B] was already using Defendant Pulido on the project and continued to use him after signing

---

[15] On appeal, J.T.B. also argues that Limon Hauling did not present evidence that the "sole transporter" representation was material (the third element), that J.T.B. intended Limon Hauling to rely on the representation (the fourth element), or that Limon Hauling relied on the representation (the fifth element). However, J.T.B. did not file a no-evidence summary judgment motion with the trial court, *see* Tex. R. Civ. P. 166a(i), and did not attempt to conclusively disprove the third, fourth, or fifth elements below. Therefore, we will only consider the grounds that J.T.B. raised in its summary judgment motion—that it could conclusively disprove that the representation was false. *Id.* at 166a(c) (requiring summary judgment motions to state the specific grounds on which judgment is sought and instructing appellate courts to only consider issues "expressly presented to the trial court by written motion").

17

a contract with Plaintiffs." The "sole transporter" language is contained in the March 30 subcontract. J.T.B. argues that Limon Hauling did in fact act as the sole transporter for the Area 8 project after the Limon subcontract was signed and therefore the representation was not false.

J.T.B.'s argument and its evidentiary support is the same as that which it used to disprove the post-March 31 breach claims: the affidavit by Ms. Pulido, the invoices, and the spreadsheet. As discussed above, this evidence is sufficient to prove that the payments to Pulido were outside the scope of the Limon subcontract, and Limon Hauling did not present any evidence in response that would raise a material question of fact regarding this element. Therefore, we hold that J.T.B. conclusively disproved that the material statement of fact was false. The trial court did not err in granting J.T.B.'s motion for summary judgment as to the fraud claim and denying Limon Hauling's counter-motion on the same claim; we overrule this issue on appeal.

## CONCLUSION

We hold that the trial court did not err in granting J.T.B.'s motion for summary judgment and denying Limon Hauling's counter-motion for summary judgment. We affirm the order of the trial court.

_____

Diane M. Henson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed

Filed:   April 30, 2009

18